Gants, Ralph D., J.
On July 10, 2006, concrete ceiling panels collapsed on the roadway of the Interstate 90 Highway Connector Tunnel (“the 1-90 Connector Tunnel") in Boston, crushing a passing car and killing one of its occupants. On November 29, 2006, the plaintiffsthe Commonwealth of Massachusetts, the Massachusetts Highway Department, and the Massachusetts Turnpike Authority (collectively, “the Commonwealth’jfiled this action against the thirteen defendants who allegedly worked on the design, construction, and/or management of the 1-90 Connector Tunnel ceiling and the three defendants who allegedly guaranteed the obligation of Modern Continentail Construction Co., Inc., the contractor who constructed this section of the tunnel.
On January 23, 2008, the Commonwealth, with the United States, entered into a global settlement with five of the defendants (“the Global Settlement’jBechtel Corporation, Bechtel Civil & Minerals, Inc., Bechtel Infrastructure Corporation, Parsons Brinckerhoff Quade & Douglas, Inc., and the joint venture of Bechtel/Parsons Brinckerhoff (collectively, “B/PB”). Under this Global Settlement, B/PB agreed to pay a total of $450,230,500 to the Commonwealth and the United States, plus accrued interest. In return, B/PB obtained a release effectively from all criminal and civil liability that may have arisen from the ceiling collapse and other alleged construction defects in the 1-90 Connector Tunnel, including the voluntary dismissal by the Commonwealth of all claims against B/PB in the instant civil case. The Global Settlement did not include any allocation of the settlement amount among the various potential claims that were released.
B/PB now moves, in light of that Global Settlement, to dismiss each of the cross claims for contribution and indemnification that have been brought against it by the other defendants. After hearing, for the reasons detailed below, B/PB’s motion to dismiss these cross claims is DENIED WITHOUT PREJUDICE.
DISCUSSION
Under G.L.c. 231B, §l(a), “where two or more persons become jointly liable in tort for the same injury to person or property, there shall be a right of contribution among them even though judgment has not been recovered against all or any of them.” G.L.c. 23 IB, §l(a). “The right of contribution shall exist only in favor of a joint tortfeasor . . . who has paid more than his pro rata share of the common liability, and his total recovery shall be limited to the amount paid by him in excess of his pro rata share.” G.L.c. 231B, §l(b). G.L.c. 23IB, §4 provides:
When a release or covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury:
(a) It shall not discharge any of the other tortfeasors from liability for the injury unless its terms so provide; but it shall reduce the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater;
(b) It shall discharge the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor.
G.L.c. 23 IB, §4.
When a defendant settles a single case with the plaintiff, the role of the court is relatively clear in determining whether to dismiss the cross claims brought against the defendant by his co-defendants if *98 the Court determines that the settlement was made in good faith, the cross claims are dismissed. Noyes v. Raymond, 28 Mass.App.Ct. 186, 188-91 (1990). See also Slocum v. Donahue, 44 Mass.App.Ct. 937 (1998) (rescript). The party relying upon the settlement in moving to dismiss the cross claims (here, B/PB) bears the burden of proving “that a settlement has been agreed upon and its nature and terms.” Noyes at 191. The settlement is presumed to be made in good faith unless the non-settling party “raises a legitimate issue of lack of good faith.” Id. Only then will the non-settling party be entitled to an evidentiary hearing, and that hearing is limited to the issue of good faith. Id. Good faith may justly be placed in issue if there is evidence of “collusion, fraud, dishonesty, [or] other wrongful conduct.” Id. at 190. A non-settling party who claims that a settlement was not made in good faith must do more than simply point to the amount of the settlement, but the amount may be considered as part of the totality of the evidence in determining whether the non-settling party has met his burden. Id. at 190; Slocum at 938. Since settlements are presumed to have been made in good faith, the Appeals Court understood that litigation over the issue of good faith would take place “only in rare instances.” Noyes at 191. The court noted that if “extended hearings on the question of good faith” were common, a “party seeking to avoid trial by settling a claim could rarely achieve that objective,” because “the issue of good faith would be the subject of a full trial.” Id. at 189-90.
The legislative purpose behind the contribution statutes is relatively clear. The Legislature provided a right of contribution because it thought it unfair that a disproportionate share of the plaintiffs recovery be borne by only one of several joint tortfeasors, and it wished to create a means to achieve a more “equitable distribution of that burden among those liable in tort for the same injuiy.” Bishop v. Klein, 380 Mass. 285, 294 (1980), quoting Hayon v. Coca Cola Bottling Co. of New England, 375 Mass. 644, 648 (1978). The right of contribution, however, would discourage settlements unless the settling defendant could be released from any obligation to contribute to co-defendants. As the Supreme Judicial Court observed in Bishop:
The National Conference of Commissioners on Uniform State Laws, which together with the American Law Institute drafted the Uniform Contribution Among Tortfeasors Act after which G.L.c. 23 IB was modeled, stated the problem and solution as follows: “No defendant wants to settle when he remains open to contribution in an uncertain amount, to be determined on the basis of a judgment against another in a suit to which he will not be a parly . . . Accordingly (§4(b)) provides that the release in good faith discharges the tortfeasor outright from all liability for contribution.” 12 Uniform Laws Annot., §4, at 99-100 (Master ed. 1975). We conclude then that G.L.c. 23IB, §4(b), was drafted to encourage settlements in multiple party tort actions by clearly delineating the effect settlement will have on collateral rights and liabilities in future litigation.
Bishop at 294.
In essence, G.L.c. 23 IB, §4 reflects the Legislature’s balancing of its desire for equitable distribution of damages among joint tortfeasors with its desire to encourage settlements. Through that balance, a settling defendant obtains a release from all claims as long as the settlement was made in good faith, while the non-settling defendants obtain a dollar-to-dollar offset of their judgment by the amount of the settlement. The requirement of good faith provides some assurance that the amount of the offset will be fair and reasonable, since it can be inferred that, in true arms-length negotiations, the plaintiff has sought to maximize the amount he recovers in settlement and the settling defendant has sought to minimize the amount he pays in settlement. The court’s role is limited to ensuring that the negotiations were truly arms-length; the court need not make an independent determination as to whether the settlement itself is fair and reasonable.
That balance, however, assumes that the scope of the settlement is limited to a single civil lawsuit, and does not encompass a global resolution of multiple lawsuits, actual and potential, civil and criminal. With a global settlement, unless the settling parties have included within the settlement agreement an allocation of the settlement amount to the various resolved claims, this balance is undone. Without an allocation, even if the global settlement was made in good faith, the Court is left with two poor alternatives if it were to allow the settling defendant’s motion to dismiss the cross claims against it: it could offset the entire amount of the global settlement against any judgment obtained by the plaintiff against the cross claiming defendants, or it could determine, after an evidentiary hearing, the fair and reasonable allocation among the various resolved claims.
The first alternative would discourage global settlements because the amount offset in the civil action would include amounts that were obtained in settlement of other claims, including actual or potential criminal charges.
The second alternative would require the Court to conduct an evidentiary hearing to determine what would constitute a fair and reasonable allocation of the settlement proceeds. Pragmatically, to determine the fair and reasonable allocation of a global settlement, especially one, as here, which resolves both civil and criminal claims, the court would need to learn:
the content of the work product the attorneys had developed regarding each claim, including the in *99 formation developed during the criminal investigation;
the attorneys’ appraisal of the evidentiary and legal strength of each claim and the likelihood that they would prevail at trial;
the attorneys’ appraisal of the likely amount of damages that would be paid if the Commonwealth and the United States prevailed in a civil trial, and of the likely sentence and fine if the Commonwealth and the United States prevailed in a criminal trial; and
the attorneys’ appraisal of the likelihood that a civil or criminal judgment would have collateral consequences, such as the debarment of a government contractor.
Here, the Commonwealth has already informed this Court that it would not learn this information from the Commonwealth if it conducted such an allocation hearing, because the Commonwealth would invoke its right to protect this information from disclosure through the attorney-client privilege and the work-product doctrine. The Commonwealth predicted that the United States would also invoke its rights and refuse to provide this information. Indeed, the Commonwealth has told this Court that all that it would learn at a hearing regarding these issues is what was said during settlement negotiations, which the Special Assistant Attorney General who participated in these negotiations predicted would shed no useful light on these issues. In theory, this Court could attempt to learn enough about the investigation of these claims to make its own determination as to each of these issues, but that would mean, as to the criminal case, that the Court would need to examine the investigative reports of interviews, the grand jury transcripts, and the physical evidence. In a case of this magnitude, that would mean that the Court would do little else for months apart from conducting this hearing.
Moreover, even if the Court had the information and the time it would need to conduct the allocation hearing, the parties could offer no guidance to the Court when it asked them what it means for an allocation to be “fair and reasonable.” For example, assuming this Court could determine the strength of the federal criminal False Claims Act allegations against B/PB, what is a fair and reasonable allocation of that risk of criminal liability with the risk of civil liability in this lawsuit? How would this Court fairly and reasonably allocate the risk of the civil debarment that would likely result from such a False Claims Act conviction, without also learning about the volume of government business that B/PB is doing and would otherwise expect to do? And how could this Court fairly and reasonably allocate that risk without also determining whether the federal government truly was willing to risk the debarment of two of its largest contractors when the nation is at war in Iraq and Afghanistan? In short, a judicial determination of a fair and reasonable allocation raises a minefield of issues that the Court would be able to resolve only by seeking to learn as much about the various investigations as the attorneys who negotiated the Global Settlement, without the attorneys themselves sharing with the Court what they knew.
Despite these practical difficulties, B/PB, joined by the Commonwealth, asks this Court to dismiss all the cross claims against B/PB and to make an allocation determination if and when such a determination becomes necessary, that is, when trial is concluded in this action. They can point to only one Massachusetts appellate caseThayer v. Pittsburgh Corning Corporationin support of their contention that the Court, despite all its difficulties, must make an allocation determination prior to final judgment when the plaintiff has entered into a global settlement with fewer than all the defendants. 45 Mass.App.Ct. 435, 440-41 (1998). Thayer, however, provides little support for this contention. In Thayer, the plaintiffs (Thayer and his wife, who claimed loss of consortium) sued various asbestos manufacturers, contending that they were responsible for Thayer’s exposure to asbestos between 1948 and 1952, which resulted in 1992 in his being diagnosed with malignant mesothelioma. Id. at 439-40. Prior to trial, Thayer settled all his claims with all but two of the defendants for $431,000, which included not only his present claim for personal injury but also any future wrongful death claim. Id. at 440. The settlement, however, made no allocation regarding these two claims. He proceeded to trial against the remaining two defendants and obtained an award at trial of $306,250 on the personal injury claim. Id. The defendants argued that they were entitled to an offset of the entire $431,000 obtained in settlement; the plaintiffs asked the court to make an allocation determination following an evidentiary hearing. Id. at 440-41. The trial judge urged the parties at trial to agree upon their own allocation but stated that he would make the determination if they could not reach agreement. Id. at 441. The parties at trial ultimately did reach agreement as to the appropriate allocation, allocating 75 percent of the settlement to the personal injury lawsuit they had tried and the remaining 25 percent to the anticipated wrongful death claim. Id. Although the issue had been mooted by the agreement of the parties and no one had preserved their right to appeal this issue, the Court nonetheless briefly considered the issue in dictum, stating:
Nothing in G.L.c. 23 IB, §4, prohibits a judge from apportioning pretrial settlements among the plaintiffs’ various claims in circumstances such as these . . . Accordingly, we conclude that the judge acted properly. If the plaintiffs prevail in any retrial, the parties should again attempt to arrive at a *100 mutually agreeable apportionment of the pretrial settlement, and if such an agreement cannot be reached, a hearing should be held at which the judge shall determine the proper allocation.

Id.

Even if this dictum were considered controlling precedent, all that it stands for is that the court should not offset the entire amount of a global settlement from a judgment obtained as to only one of those claims, and may determine the proper allocation following a hearing. It does not mandate that the court determine an allocation in every global settlement. Moreover, there are at least three fundamental differences between this case and Thayer. First, in Thayer, all that needed to be allocated was two civil claims involving essentially the same plaintiffsThayer’s personal injury claim and his future executor’s wrongful death claim. Here, an allocation would involve an allocation among this civil claim, other potential civil claims, and various potential criminal claims, brought not only by the Commonwealth but also by the federal government. Second, in Thayer, the question of allocation did not appear to arise until after all claims against the settling defendants had been dismissed and the jury rendered its verdict, so the trial judge’s options were severely limited. Here, it has been raised well in advance of trial and before any cross claims against the settling defendants have been dismissed. Third, in Thayer, the plaintiffs and the non-settling defendants reached agreement as to the proper allocation. Here, there is no agreement, either among the settling parties or among the plaintiffs and non-settling defendants.
This Court recognizes that, under Thayer, it has the authority to determine allocation after hearing if it considered such a determination to serve the interests of justice. But this Court also recognizes that Thayer does not require this Court to make such a determination, especially when doing so would be so extraordinarily difficult and time-consuming that it would be nearly impractical.[1]
This Court finds that B/PB is not entitled to the dismissal of cross claims unless and until it satisfies both the letter and spirit of G.L.c. 23IB, §4. This Court notes that G.L.c. 23IB, §4(a) provides that, when a defendant through settlement obtains a good faith release from the plaintiff, the amount of the claims against the non-settling defendants shall be reduced “to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is greater.” G.L.c. 23IB, §4. When the settlement, however, is a global settlement, especially a global settlement that includes non-parties (such as the United States) and criminal claims, the “extent of any amount stipulated by the release or the covenant" to settle the instant civil claim, or “the amount of the consideration paid” for [the instant civil claim] cannot be determined unless the settlement includes an allocation of the settlement amount among the various released claims. Stated bluntly, until the Global Settlement sets forth the amount allocated to the settlement of the ins tant civil claim that can be used to offset any judgment to be entered against the non-settling defendants, there is no settlement that entitles B/PB to the release of the cross claims. If and when such an allocation is provided, the non-settling defendants will have an opportunity to meet their burden of challenging the good faith of the allocation. If they satisfy that burden, this Court will then permit discoveiy and conduct an evidentiary hearing limited to the same issue of good faith that applies to any settlement.
There is no good reason why this Court should take on the formidable burden of determining an allocation when the settling parties can do so far more easily, with far better access to the information needed to make this allocation. While the settling parties’ allocation, as part of the Global Settlement itself, shall be accepted by the Court if made in good faith, there is good reason to believe that the allocation reached by the parties, if made through arms-length negotiation, will be fair and reasonable. B/PB will have an incentive to maximize the amount allocated to the instant civil claim so as to minimize the risk that the Court will find the allocation to have been made in bad faith. The Commonwealth will have an incentive to minimize the amount allocated to the instant civil claim to minimize the amount offset against any judgment it may obtain from the non-settling defendants, but it will be constrained by public statements that it made at the time of settlement regarding the adequacy of the amount it received to resolve the instant claim.
If the parties cannot reach any agreement on allocation, then B/PB will continue to be a cross claim defendant. This Court notes that the Global Settlement expressly considered this possibilityparagraph 41 provides that, if B/PB remains a defendant in this case and a judgment is obtained against it by any cross claimant, the Commonwealth agrees to reduce its judgment against the cross claimant by the amount of the cross claim judgment against B/PB in order to obtain a release or settlement of that cross claim against B/PB. Global Settlement at 41, p. 29.
While this Court will not dismiss the cross claims for contribution against B/PB until the parties to the Global Settlement agree upon the amount allocated to the settlement of the instant civil complaint that can be used to offset any judgments against the non-settling defendants, it makes sense to determine now what that allocation need include, lest we find ourselves with ambiguity following trial as to how to implement the offset. This Court recognizes that the complaint seeks damages for various defects in the 1-90 Connector Tunnel, but the claims *101 against certain defendants may be narrower than others because certain defendants may have worked on only portions ofthatTunnel. Therefore, this Court directs the non-settling defendants, no later than June 6, 2008, to propose to the Court which claims need be included in the settlement allocation. The settling parties may respond no later than June 20, 2008. Unless there is agreement among all parties, this Court will conduct a hearing on June 24, 2008 at 2:00 p.m. to identify with precision the scope of the settlement allocation that is needed for B/PB to obtain dismissal of the cross claims for contribution.[2]
ORDER
After hearing, for the reasons detailed above, B/PB’s motion to dismiss the cross claims for contribution and indemnification is DENIED WITHOUT PREJUDICE. The non-settling defendants, no later than June 6, 2008, shall propose to the Court which claims need be included in the settlement allocation. The settling parties may respond no later than June 20, 2008. Unless there is agreement among all parties, this Court will conduct a hearing on June 24, 2008 at 2:00 p.m. to identify with precision the scope of the settlement allocation that is needed for B/PB to obtain dismissal of the cross claims for contribution

 This Court also notes another danger posed by the Commonwealth’s proposal that the Court make an allocation determination following the jury’s verdict. The non-settling defendants argue that the Commonwealth has already been fully compensated for all losses it suffered from the roof collapse of the T90 Connector Tunnel. If they are correct, even if the Commonwealth were to prevail at trial against the remaining defendants, these defendants would owe nothing, because the amount offset would exceed the amount of the judgment. The Commonwealth strongly disputes this contention but the fact remains that, under the Commonwealth’s proposal, the Court potentially could conduct a lengthy trial, followed by a lengthy allocation hearing, only to find that all of this work was for naught because the offset exceeded the amount of the judgment. It makes far better sense for the allocation to be established well in advance of trial, so that all parties ’can use this information in deciding whether to proceed to trial or to settle.

 This Court expressly reserves its decision as to whether a proper settlement allocation also requires dismissal of the cross claims for indemnification. That issue will be addressed if and when the settling parties agree upon a settlement allocation.